[Cite as *In re K.R.*, 2021-Ohio-3622.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | | JUDGES: |
| IN THE MATTER OF: | : | Hon. W. Scott Gwin, P.J. |
| K.R. AND K.R. | : | Hon. John W. Wise, J. |
| | : | Hon. Earle E. Wise, J. |
| | : | |
| | : | |
| | : | |
| | : | Case Nos.    2021 CA 00037 |
| | : |                     2021 CA 00038 |
| | : | |
| | : | OPINION |

CHARACTER OF PROCEEDING:          Civil appeal from the Stark County Court of
                                                          Common Pleas, Juvenile Division,  Case
                                                          Nos.2018JCV00475

JUDGMENT:                                       Affirmed

DATE OF JUDGMENT ENTRY:           October 7, 2021

APPEARANCES:

For SCDJFS                                       For Appellant-Mother

BRANDON J. WALTENBAUGH           BERNARD L. HUNT
SCDJFS                                             2395 McGinty Road N.W.
402 2nd Street S.E.                            North Canton, OH  44720
Canton, OH 44702


For Appellee-Custodians

RUSSELL BUZZELLI
P.O. Box 84
Wadsworth , OH  44282

*Gwin, P.J.*

{¶1} Mother appeals the March 15, 2021 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, granting legal custody of K.R.(1) and K.R.(2) to custodians R.R. and T.R., and denying Mother's motion for custody.

*Facts & Procedural History*

{¶2} A.B. is the Mother ("Mother") of four children, including K.R.(1), born on December 30, 2006, and K.R.(2), born on February 3, 2010. M.B. is the father of Mother's two younger children, G.B. and L.B. The father of K.R.(1) and K.R.(2) is deceased. R.R. and T.R. ("Custodians") are the paternal aunt and uncle of K.R.(1) and K.R.(2).

{¶3} On May 10, 2018, SCDJFS filed a complaint alleging K.R.(1), K.R.(2), and G.B. were dependent, neglected, and abused children. The complaint alleged as follows: SCDJFS received multiple referrals regarding the family dating back to October of 2017; there were concerns about domestic violence in the home and concerns about substance abuse by both Mother and M.B.; there were reports that K.R.(1) was acting as the primary caretaker for the younger children; school officials reported several incidents of concern; K.R.(1) sent a group text indicating she was going to commit suicide; SCDJFS contacted Mobile Youth Crisis for K.R.(1); SCDJFS observed multiple adults coming out of the home with large black trash bags; Mother denied substance abuse concerns, but refused to take a drug test; K.R.(2) and G.B. had multiple observable scratches and bruises; Mother was recently charged with OVI and possession of a controlled substance; M.B. was recently convicted of domestic violence against Mother; both K.R.(1) and K.R.(2) made multiple concerning statements regarding events and inappropriate circumstances that

occurred while living with Mother and M.B.; and K.R.(1) and K.R.(2) repeatedly expressed concern of returning to their prior home environment.

{¶4} The magistrate held a shelter care hearing on May 11, 2018. On the same day, Custodians filed a motion for legal custody of K.R.(1), K.R.(2), and G.B. The trial court issued a judgment entry on August 1, 2018, finding K.R.(1), K.R.(2), and G.B. dependent. Further, the court found "Mother was not available to care for the children as she has absconded law enforcement and there are warrants out for Mother's arrest." The case then proceeded to disposition. The disposition entry, also filed on August 1, 2018, placed K.R.(1), K.R.(2), and G.B. in the legal custody of Custodians.

{¶5} Mother filed a motion for change of custody and/or motion for visitation with regards to K.R.(1), K.R.(2), and G.B. on December 28, 2018. SCDJFS filed a complaint with regards to L.B. in February of 2019 a week after her birth. Mother tested positive for various substances during her pregnancy with L.B., including cocaine, marijuana, and methamphetamines.

{¶6} The trial court conducted a trial on Mother and Custodians' motions on September 1, 2020 and September 15, 2020. The trial court also held an in-camera interview of K.R.(2), as requested by Mother, on November 12, 2020.

{¶7} Mother testified she lost her children in 2018 when her oldest child threatened suicide. Mother admitted she was addicted to methamphetamines from November of 2017 to March of 2018. She also admitted that, at the beginning of the case, she misrepresented her substance abuse issues to SCDJFS. In 2017, M.B. pushed her and yelled at a lot. Both she and M.B. were abusing drugs. M.B. has a brain injury and suffers from post-traumatic stress disorder from being the military. After Mother lost the

children, she went to Florida to be with her mother. She used cocaine in July of 2018. When her brother overdosed in Ohio, she returned for several months, but then returned to Florida. Mother returned to Ohio to stay in February of 2019.

{¶8} Mother began counseling in 2018 and remains in counseling today for grief/trauma issues and drug abuse. Mother completed drug screens several times per week and stated she was negative every time. Mother described her Vyvanse and Adderall medications, and stated she informed SCDJFS when those prescriptions changed.

{¶9} Mother stated she has complied with her case plan. Mother testified she is currently working, taking care of a hospice patient. Mother completed the Goodwill parenting program and is going through the home-based visitation program. She believes she has done everything SCDJFS has asked of her to make the home appropriate.

{¶10} Mother also attends counseling with K.R.(1) and K.R.(2). Mother knows that K.R.(1) is angry at her; however, Mother believes this anger is misplaced. Mother stated she is now clean and sober, and she has made significant changes in her life since she lost custody of the children. She believes it is in the best interest of the children to be returned to her care.

{¶11} On cross-examination, Mother confirmed there was a no-contact order between her and M.B. when she got pregnant with L.B.

{¶12} Jennifer Fire ("Fire") is the supervisor of the Goodwill parenting program. Fire testified that Mother successfully completed the Goodwill parenting program; however, Mother failed on the individual goals portion of the program. Mother's home was appropriate and, when Fire visited, Mother was utilizing the safety plan put in place

by SCDJFS. Fire had concerns regarding Mother's substance abuse issues because, throughout the program, Mother vacillated from accepting responsibility of that to minimizing it; Fire stated Mother never accepted full responsibility for her substance abuse problems, and blamed it on her ADHD and childhood trauma. Fire testified that Mother minimized the impact that her substance abuse and domestic violence had on her children.

{¶13} Nicole Hadden ("Hadden") is the ongoing caseworker for L.B. For both Mother and M.B., their case plans required they complete parenting assessments, complete assessments at CommQuest, and follow any recommendations. M.B. complied with the recommendations from his parenting evaluation, as he had to continue counseling and medication services through the VA; comply with the orders of his probation from his domestic violence conviction; and complete substance abuse treatment. There were ongoing concerns with M.B. because his memory and mood dysregulation, and his questionable judgment related to a traumatic brain injury.

{¶14} Mother was required to comply with Summit Psychology for her medication and counseling, complete parenting classes, and attend joint counseling with M.B. Mother initially was set up for the color code for approximately six months to monitor her for illegal substances. Mother completed the parenting class, is in counseling each week, and completed the color code drug screens when asked.

{¶15} While Mother testified that she notified Hadden as soon as the doctor increased her medication, Hadden stated that Mother advised her on June 9th by email that she had a change in medication only after the aide had drug tested her that day. This concerned Hadden with regards to Mother's long-term sobriety.

{¶16} When the home-based visits started, L.B. visited alone. However, when G.B. was added to the visits, Hadden testified that the clutter and things in the home that they previously worked on getting rid of started to come back and it was difficult for Mother and M.B. to manage both children. Hadden knew the visits were difficult because of her interactions with Mother and because Hadden supervised some of the visits herself. For example, Mother's behavior became increasingly erratic during the visits when both G.B. and L.B. were there.

{¶17} The GAL contacted Hadden after the review hearing in July of 2020, expressing concern about Mother's appearance and behavior in court. Hadden wrote a letter to Mother's doctor about her concerns with Mother's medication. Based upon Hadden's review of her notes and the records she received after Mother signed a release of information, it appeared that Mother was asking her doctor for Adderall. Mother's doctor provided a letter to Hadden stating she is compliant with medication and he did not see a concern prescribing Adderall.

{¶18} While Hadden believes the primary goal is reunification, she has concerns that need to be addressed. Her concern for Mother's sobriety still remains, as does her concern about Mother's dishonesty. Hadden testified that Mother has a history of being dishonest with her throughout the proceedings.

{¶19} Kristin Guardado is the guardian ad litem ("GAL") for all four children.

{¶20} K.R.(1) and K.R.(2) described to Guardado a life of chaos and anxiety, including watching Mother and M.B. do drugs and M.B. physically abuse Mother. K.R.(1) felt it was her responsibility to care for G.B.

{¶21} When Guardado first met K.R.(1) and K.R.(2), they were very thin, had extreme anxiety, and were very fearful Custodians would leave them. Both children talk a lot about domestic violence between Mother and M.B. and their continual drug use. Both children were very afraid to talk to anyone because Mother told them if they talked to people, Mother would go to jail. When K.R.(1) and K.R.(2) lived with Mother and M.B. prior to their removal, the house was filthy and the children were taking care of themselves. K.R.(1) and K.R.(2) had issues with school attendance. K.R.(1) told Guardado that Mother permitted her half-brother to live in the home, despite K.R.(1)'s reporting to Mother that the half-brother abused her.

{¶22} K.R.(1) and K.R.(2) are doing very well with Custodians. When Mother stopped her visitation with them, their anxiety and physical issues substantially decreased. They are doing well in school. Both have expressed fear at being returned to Mother's care, and they do not trust her. Both are afraid of M.B. due to his past acts of domestic violence against Mother. Guardado testified it would be detrimental for K.R.(1) and K.R.(2) to be returned to Mother. Guardado believes Custodians continue to facilitate a relationship between Mother and the children. However, Guardado believes the two children should not be around M.B. until the counselor feels it is appropriate. Guardado thinks legal custody to Custodians is in the best interest of both children.

{¶23} On cross-examination, Guardado confirmed Mother has completed portions of her case plan. However, Guardado stated the children still have issues, and some of the concerns arising at the beginning of the case with regards to Mother and M.B. still continue on.

{¶24} The trial court also admitted Guardado's August 2020 report into evidence. She believes it is in the best interest of the children for: (1) Custodians to maintain legal custody of K.R.(1), K.R.(2), and G.B.; (2) Custodians to be granted legal custody of L.B.; (3) Mother's motions to terminate and return to be denied; (4) Mother to continue to participate in therapeutic visits with K.R.(1) and K.R.(2); (5) K.R.(1) and K.R.(2) to not be around M.B. until their counselor feels it is appropriate; (6) Mother and M.B. to have weekly 2-hour visits with L.B. and G.B.; and (7) M.B. not to be left unsupervised with the children.

{¶25} Guardado reports that the children are thriving in their current home. They are all very close.

{¶26} Guardado included many details in her report, but concluded that she has concerns about returning any of the children to Mother. This is due to Mother and M.B.'s dishonesty throughout the case and their inability to take responsibility for their actions and instead blame others. Guardado stated the parties failed to alleviate the risks that were present at the time of the removal.

{¶27} Amanda Van Buren ("Van Buren") is a family coach at Goodwill parenting's home-based parenting program. She works with Mother and M.B. weekly.

{¶28} Van Buren stated the visits with G.B. and L.B. are inconsistent. While some visits go smoothly, sometimes Mother would rather discuss her own issues instead of spending time with the children. Initially, Van Buren and Mother addressed some safety concerns in the home. Van Buren recently had to address some issues in the home in July. Van Burden also stated there are times where Mother and M.B. failed to adequately supervise the children. Van Buren testified Mother's behavior is inconsistent, and has

become more erratic since July. Her main concerns regarding the safety of the children are: consistent demeanor, ability to supervise the children, and substance abuse.

{¶29} Jessica Skrzypiec ("Skrzypiec") is a licensed clinician who did an assessment on Mother and continues to be her counselor. Her diagnoses were adjustment disorder, ADHD, and major depressive disorder. Mother was not truthful during her initial assessment about her substance abuse. However, during treatment in March of 2019, Mother admitted abusing her prescription Adderall. Skrzypiec stated Mother's treatment has progressed well and she is not currently worried about Mother abusing medication because Mother has done well and has done everything Skrzypiec has asked her to do.

{¶30} On cross-examination, Skrzypiec confirmed that on August 28, 2020 Mother was very upset because she lost her job. However, Mother testified on September 1, 2020 that she was still employed; thus, Mother lied to the court.

{¶31} R.R. is the current custodian of the children and has been since February of 2018. R.R. will follow any orders of the court with regards to this case. R.R. believes it is in the best interest of the children for R.R. and her husband to have legal custody of the children, but also believes that Mother should have a relationship with G.B. and L.B. With regards to visitation with K.R.(1) and K.R.(2), R.R. defers to the children's counselor as to when that is appropriate.

{¶32} The trial court issued an extensive judgment entry on March 15, 2021.

{¶33} The trial court found the GAL's testimony credible and noted it took her report into consideration in its decision. Additionally, the trial court stated it agreed with the concerns reported by the GAL.

{¶34} The trial court found Mother's testimony questionable. As the first day of trial progressed, "Mother's testimony became more garbled and lacking in a clear direction. It was as if Mother placed some marbles or cotton in her mouth during the break session. Her recollection of events, especially as to time, degraded throughout cross-examination." The trial court cited several specific portions of Mother's direct and cross-examination to illustrate its point.

{¶35} The trial court found the credible testimony and the in-camera interview with K.R.(2) clearly establish that K.R.(1), K.R.(2), and G.B. were subjected to extremely traumatic events while living with Mother, including missing meals, witnessing domestic violence, witnessing drug abuse, suffering sexual abuse, and having their educational needs neglected. However, Mother continues to deny or downplay this trauma, and even testified that her children's "stories" changed, questioning their credibility.

{¶36} The trial court found the credible evidence bolstered the following concerns of the GAL: that Mother has not been truthful throughout the case; that Mother does not accept responsibility for the traumatic experiences of her children; and Mother continues to use excuses. Though Mother testified she is "in a different place completely" than before, the trial court stated the balance of the testimony does not support Mother's assertion.

{¶37} The trial court determined the evidence demonstrates Mother is not adequately able to supervise the children. For example, Fire testified Mother failed in her individual goals and she still had concerns about Mother because of her drug use. Further, Van Buren gave credible testimony that M.B. continues to have issues in discussing his triggers, and the visits with Mother and M.B. were inconsistent, and during

one visit, G.B. escaped from the home because the door was not locked and she was not being adequately watched. The trial court also noted Skrzypiec's testimony that Mother was dishonest about her substance abuse, and that Mother is frequently overwhelmed.

{¶38} The trial court found Mother is not suitable to care for any of the children at this time. Further, the credible evidence establishes that R.R. and T.R. are capable and willing to care for and support all four of the children, and put the best interest of the children ahead of their own interests.

{¶39} The trial court then did an extensive review of the relevant best interest factors contained in R.C. 3109.04(F)(1)(a-j), and addressed them as follows: (a) Mother testified she wants legal custody of all four children; however, the court questioned the sincerity of this request; (b) the interview with K.R.(2) confirmed the concerns of the GAL and did not support Mother's testimony that K.R.(2) wanted to live with her; (c) the children are bonded with each other and bonded to R.R. and T.R., while there is no healthy bond between the children and Mother; (d) the children are doing well in the home of Custodians, as this is a safe, loving, and healthy environment; however, Mother could not meet the emotional, educational, or basic needs of the children and there is a legitimate concern that the return of any of the children to her would place them at risk physically and emotionally; (e) M.B. is 100% disabled due to a traumatic brain injury, is not able to care for any of the children, and has committed acts against Mother in the past; Mother and M.B. have used drugs; Mother's presentation in court was "off" and she appeared to be suffering from some physical or mental ailment; Mother struggles with mental health stability and has trouble telling the truth; (f) Custodians appear most likely to facilitate

visitation; Mother did not follow orders in other cases and was not truthful with the GAL; and (g) Mother indicated child support is not current.

{¶40} The trial court concluded, upon review of the testimony presented and review of the above-factors, it is in the best interest of K.R.(1) and K.R.(2) for Custodians to be granted legal custody.  Further, it would not be in the best interest of K.R.(1) or K.R.(2) for Mother to be named their legal custodian.

{¶41} The trial court named R.R. and T.R. the legal custodians of K.R.(1) and K.R.(2), and denied Mother's motion for custody.

{¶42} Mother appeals the March 15, 2021 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, and assigns the following as error.

{¶43} "I. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR A CHANGE OF LEGAL CUSTODY AND FOR A MOTION TO RETURN AND TERMINATE.

{¶44} "II. THE TRIAL COURT'S JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND VIOLATED MOTHER'S DUE PROCESS RIGHTS."

*Legal Custody*

{¶45} The award of legal custody is "not as drastic a remedy as permanent custody." *In re L.D.*, 10th Dist. Franklin No. 12AP-985, 2013-Ohio-3214.  This is because the award of legal custody does not divest parents of their residual rights, privileges, and responsibilities.  *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188.

{¶46} Before awarding legal custody to a non-parent, a trial court must ordinarily make a finding that each parent is unsuitable.  *In re L.P.*, 5th Dist. Muskingum No. CT2016-0045, 2017-Ohio-52, citing *In re Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208.

This requirement does not apply, however, in cases involving abuse, neglect, or dependency. *Id.* The Ohio Supreme Court has held that, "[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents." *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188. Thus, "[w]hen a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent." *Id.*

{¶47} In this case, both K.R.(1) and K.R.(2) were adjudicated dependent.

{¶48} R.C. 2151.353(A) states, in pertinent part,

If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

* * *

(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings * * *.

{¶49} A trial court "must have wide latitude in considering all the evidence" and a custody decision will not be reversed absent an abuse of discretion. *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159, citing *Miller v. Miller*, 37 Ohio St.3d 71, 523 N.E.2d 846 (1988). As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and

credible evidence upon which the finder of fact could base its judgment. *Cross Truck Equip. Co. v. The Joseph A. Jeffries Co.*, 5th Dist. Stark No. CA5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent and credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶50} Unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence. *In re S.D.*, 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013-Ohio-5752.

{¶51} Issues relating to the credibility of the witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility "is crucial in a child custody case, where there may be as much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 674 N.E.2d 1159.

### I. & II.

{¶52} Mother contends the trial court's decision to grant legal custody to Custodians was against the manifest weight of the evidence because she was compliant with her case plan. Mother argues she completed her case plan services, has employment, and is medically compliant. She also contends the trial court's finding it was in the best interest of the children for Custodians to be awarded custody was against the

manifest weight of the evidence because she was bonded to the children and completed her case plan.

{¶53}  We disagree with Mother.

{¶54}  The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, and a trial court must base its decision on the best interest of the child.  *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188; *In re P.S.*, 5th Dist. Stark No. 2012CA00007, 2012-Ohio-3431.  When determining the issue of legal custody, the trial court should consider the totality of the circumstances.  *In re D.T.*, 5th Dist. Stark No. 2013CA00252, 2014-Ohio-2495.  Trial courts should consider all factors relevant to the best interest of the child.  *Id.*  This may include the best interest factors contained in R.C. 2151.414(D) and/or R.C. 3109.4(F), including:  the wishes of the child (expressed to the court or through the GAL) and the child's parents; the child's interactions and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child; the custodial history of the child; the child's need for a legally secure placement; the child's adjustment to their home, school, and community; the mental and physical health of all persons involved in the situation; and the person more likely facilitate court-approved parenting time rights or visitation.

{¶55}  Mother contends she has completed all her case plan requirements.  However, the successful completion of a case plan is not dispositive on the issue of reunification.  *In re W.A.J.*, 8th Dist. Cuyahoga No. 99813, 2014-Ohio-604.  While it may be in Mother's best interest to complete the case plan, this is only one factor for a trial court to consider what is in the best interest of the child, and, "in legal custody cases, trial

courts should consider all factors relevant to the best interest of the child." *In the Matter of D.P. and G.P.*, 5th Dist. Stark No. 2010CA00348, 2011-Ohio-1907.

{¶56} Where a parent has participated in his or her case plan and completed most or all of the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement. *In the Matter of A.L. and J.L.*, 5th Dist. Guernsey No. 11 CA 23, 2012-Ohio-481. In this case, the GAL testified that while Mother has substantially completed her case plan, Mother failed to alleviate the risks present at the time of removal and the same concerns present at the beginning of the case still continue today.

{¶57} The issue in this case is whether the preponderance of the evidence demonstrated it was in the best interest of K.R.(1) and K.R.(2) to grant legal custody to Custodians. The trial court issued a detailed, thorough, and well-reasoned analysis as to why it determined it was in the best interest of K.R.(1) and K.R.(2) to grant legal custody to Custodians and deny Mother's motions. Further, though Mother contends she substantially remedied any problems leading to agency involvement, the testimony and evidence presented at the hearing do not support this conclusion.

{¶58} We find the determination by the trial court is supported by competent and credible evidence.

{¶59} Mother had no contact with K.R.(1) or K.R.(2) for an extended period of time while she was in Florida. Fire has continued concerns about Mother's substance abuse because she never accepted responsibility, and instead blamed it on her medical conditions and/or childhood trauma. Hadden similarly has concerns that remain about Mother's long-term sobriety, particularly due to the Mother's increasingly erratic behavior

throughout the proceedings. The GAL also has concerns that remain about Mother's sobriety because of her recent jumpy and inappropriate appearance. Van Buren described Mother's behavior as inconsistent throughout the case, and more erratic since July. Van Buren has concerns about Mother's substance abuse. The trial court found Mother's testimony about her remedying of concerns to not be credible and stated Mother's testimony was garbled, lacked direction, and her recollection was not clear.

{¶60} Hadden and the GAL testified to Mother's dishonesty and inability to take responsibility for her actions throughout the proceedings, and stated she had not remedied these concerns. Skrzypiec confirmed Mother initially lied to her about her substance abuse and lied to the court about her employment.

{¶61} Additionally, multiple witnesses had concerns about the visits K.R.(1) and K.R.(2)'s younger siblings had with Mother. Hadden stated it was difficult for Mother to manage both children. The GAL stated Mother could do short visits with G.B. and L.B., but could not manage them full-time. Van Buren stated the visits were inconsistent, and she had concerns about both Mother and M.B.'s ability to supervise the children.

{¶62} The GAL testified it is in the best interest of K.R.(1) and K.R.(2) for legal custody to be granted to Custodians. Both have expressed fear about being returned to Mother's care, and they do not trust her. When Mother stopped her visitation with them, their anxiety and physical issues substantially decreased. Both are afraid of M.B. due to his past acts of domestic violence against Mother. Guardado stated it would be detrimental for K.R.(1) and K.R.(2) to be returned to Mother, and believes Custodians will continue to facilitate a relationship between Mother and the children. However, Guardado believes the two children should not around M.B. until the counselor feels it is appropriate.

Guardado testified that while Mother has worked hard, she is unable to appropriately parent. The interview of K.R.(2) confirmed the concerns of Guardado and does not support Mother's testimony that K.R.(2) wants to live with her.

{¶63} Guardado testified K.R.(1) and K.R.(2) are doing very well with Custodians. Hadden describes Custodians as loving, cooperative, attentive, and bonded to the children. Further, G.B., L.B., K.R.(1), and K.R.(2) are very bonded to each other.

{¶64} Mother also claims the trial court did not consider the testimony about her good visits, her continued counseling, and case plan compliance in its decision. However, while there was testimony about her case plan compliance and several good visits, there was also testimony by multiple witnesses that the visits were inconsistent and many concerns still remained. As this Court has previously stated, the trial court may believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (4th Dist. 1998). Further, as discussed above, Mother's compliance with her case plan is only one factor to consider in the best interest determination.

*Due Process*

{¶65} In the title of her second assignment of error, Mother asserts the trial court's decision violated her due process rights. However, Mother makes no argument in the body of her brief as to how or why her due process rights were violated.

{¶66} "If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out." *Thomas v. Harmon*, 4th Dist. Lawrence No. 08CA17, 2009-Ohio-3299, quoting *State v. Carman*, 8th Dist. Cuyahoga No. 90512, 2008-Ohio-4368. "It is not the function of this court to construct a foundation for [an appellant's] claims; failure

to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." *Catanzarite v. Boswell*, 9th Dist. Summit No. 24184, 2009-Ohio-1211. Therefore, "[w]e may disregard any assignment of error that fails to present any citations to case law or statutes in support of its assertions." *Frye v. Holzer Clinic, Inc.*, 4th Dist. Gallia No. 07CA4, 2008-Ohio-2194; See also App.R. 16(A)(7); App.R. 12(A)(2); *State v. Norman*, 5th Dist. Guernsey No. 2010-CA-22, 2011-Ohio-596; *State v. Untied*, 5th Dist. Muskingum No. CT2006005, 2007-Ohio-1804.

**{¶67}** As pointed out by SCDJFS, Mother has made no argument to support this assertion, nor has she supported her allegations with references to the record or citations to authority to support a finding that the trial court violated her due process rights. Appellate Rule 16(A)(7) requires an appellant to include in his or her briefs, "* * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions * * *." We may not create an argument for Mother as to why her due process rights were violated. See *State v. Carter,* 5th Dist. Richland No. 2020-CA-0031, 2021-Ohio-358.

*Conclusion*

**{¶68}** Based on the foregoing, we find the trial court did not commit error in awarding legal custody of K.R.(1) and K.R.(2) to Custodians or in denying Mother's motion for custody.

**{¶69}** Accordingly, Mother's assignments of error are overruled.

{¶70}   The March 15, 2021 judgment entry of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Wise, John, J. and

Wise, Earle, J. concur